## No. 6531.

### BERNARD SOULIÉ VS. LOUIS RANSON.

The charge given to a jury, by the judge of the court *a qua*, is not a necessary part of the record.

Declarations, averments, and admissions made by parties in judicial proceedings can not be subsequently denied by them.

The agreement by which a creditor, who has bought his debtor's property, stipulates to reconvey it to the debtor on condition that the latter pays a certain price within a certain time, is a valid contract, and if the debtor fails to pay the price, in accordance with the terms of said contract, his right of redemption will be forfeited, and the title of the property will vest absolutely in the purchaser.

| 29 | 161 |
| 105 | 583 |
| 29 | 161 |
| 107 | 398 |
| 29 | 161 |
| 125 | 931 |

APPEAL from the Fourth Judicial District Court, parish of St. Charles. *Flagg*, J. Trial by jury.

*James D. Augustin* and *Charles E. Schmidt*, for plaintiff and appellant.

*Gus. A. Breaux* and *Julien Michel*, for defendant.

The opinion of the court was delivered by

MANNING, C. J. The defendant was indebted to the plaintiff for loans and advances made before the late war, amounting to $26,703 66, the payment of which was secured by mortgage upon his sugar plantation in the parish of St. Charles. In 1867 plaintiff sued upon his debt, and recovered judgment for the above sum with eight per centum per annum interest, and twelve hundred dollars attorney's fees, and his mortgage was recognized. Execution issued upon this judgment, and in April, 1868, the plaintiff bought the mortgaged property at sheriff's sale for eighteen thousand dollars cash.

11

Previous to the institution of that suit a verbal arrangement had been made by the parties, which was reduced to writing and signed the twenty-third of January, 1868, before the issuance of the *fieri facias*, and which is of so much importance that its chief provisions shall be quoted *in extenso*. It may be observed that the coroner was the executive officer who conducted the sale, the defendant, Ranson, being the sheriff of the parish at that time.

The preliminary recital mentions the name and the residence of the plaintiff and defendant, and declares that the agreement witnesseth—

First—That the said Soulié shall cause to be seized and sold by the coroner of the parish of St. Charles, by virtue of a judgment rendered in the Fourth Judicial District Court for said parish, in the case of Bernard Soulié vs. L. Ranson, No. 590 of the docket of said court, a certain tract of land belonging to the said Ranson, established as a sugar plantation and situated in said parish on the right bank of the river Mississippi, between lands belonging to Mr. J. L. LaBranche above and lands of Freret Brothers below, and the undivided half of that certain tract of land lying on the Opelousas railroad and on the Bayou des Allemands, known as the Vacherie; as the whole is more fully described in the petition filed in the above-entitled suit,

Second—That the said Ranson will pay all expenses attending the issuing of the *fieri facias* and the sale of the plantation, including advertisements, commissions, etc., and that he shall cause the property to be appraised at the lowest figure possible.

Third—That the said Soulié binds himself to bid in and buy the said property at the said coroner's sale; provided it be not bid up by other parties over $36,400.

Fourth—And the said Soulié binds himself, in case the above article should take effect, to reconvey and sell to such persons as the said Louis Ranson shall designate, with a good and sufficient title, but without warranty, the above-described portion of ground on the river Mississippi, established as a sugar plantation, for the price or sum of $36,350, payable in five equal installments of one, two, three, four, and five years, in notes bearing mortgage on said property, with interest at the rate of eight per cent per annum from the first of March, 1868, the clause of *non alienando*, and five per cent as lawyer's fees in case of proceedings to enforce the payment of said notes.

Provided, that in case the said Ranson shall not have designated a person to whom the sale of the property is to be made, and who shall execute the notes as above provided, prior to the first of March, 1869, then the first installment due agreeably to this article on that day, with eight per cent interest, shall be paid by said Ranson, and his failure so to do shall work a nullity of this contract, without his being put in *mora*, and so for the following successive installments.

Fifth—It is the spirit of this agreement that the crops to be made on said plantation are to be wholly affected to the payment of its price as above stipulated. Therefore the said Ranson, or the person he may appoint, promises to give all his attention to the culture (cultivation) of the land and the preservation of the improvements; to use his best efforts to make crops as large as possible, and he binds himself to apply the entire net proceeds of said crops—after paying the expenses incurred for raising the crops with the utmost economy—to the payment of said notes or installments, with interest as above stipulated.

The sixth clause relates to another tract called the Vacherie, which Soulié engages to sell if he can, on such terms and conditions and at such price as he may think proper, and to apply the sum realized by such sale to the extinguishment *pro tanto* of the notes specified in the fourth clause.

From the close of the war in 1865 to the date of this agreement the plantation does not appear to have been cultivated, except in making the necessary preparations for a sugar crop. The condition of the place at the close of the war precluded any attempt at successful cultivation. It had been in some sort abandoned, the fences and houses were dilapidated, the ditches filled, and the former cultivated fields had become a waste, covered only with weeds and willows. In 1868 the preparations for future cultivation had been brought to sufficient forwardness to permit the hope of a crop for the following year, and on the twentieth of January, 1869, Ranson made application to the firm of B. & A. Soulié for assistance in the way of supplies and advances to make a crop during that year. The result of this application was an agreement by which that firm engaged to make advances not to exceed eight hundred dollars monthly, upon which they were to charge a stipulated interest and commissions. This arrangement lasted four years, viz.: from 1869 to 1872, inclusive, and at the expiration of that time the expenses incurred by Ranson and paid by the Soulié firm largely exceeded the receipts from sale of crops. Bernard Soulié became subsequently the transferee of this claim of the firm.

Near the close of 1872 Soulié declined to advance money or furnish supplies any longer, and then followed correspondence and negotiation which will be detailed at length in plaintiff's testimony, the result of all being that Soulié persisted in his refusal, and at length leased the property to John Kelly, who took possession of the plantation. About the same time, or shortly thereafter, Ranson removed eight mules from the place, and, after an interval of a day or two, fourteen other mules and all the implements of husbandry, etc.

Thereupon the present suit was instituted, wherein the plaintiff alleges that the defendant had tortiously removed those mules and other speci-

fied property, in value three thousand dollars, from his plantation, and prayed and obtained writs of sequestration, which after some delay were executed. Exceptions having been made to the sufficiency of the averments of the sequestration, and overruled, the defendant answered, denying that any of the objects thus sequestered belonged to plaintiff, and prayed damages for the illegal sequestration. Then, assuming the quality of plaintiff in reconvention, " he admits and avers that the plantation mentioned in the petition belongs to plaintiff, who has acquired it as stated in the petition, and he further admits and avers that after the adjudication thereof to plaintiff he, Ranson, continued in the possession thereof with the right of working the same on condition that he would send his crops to the plaintiff, Soulié, to be disposed of by the firm of B. & A. Soulié, of which he is a member, the proceeds to be applied to the payment of all disbursements made for the working of the plantation, the balance to be paid over to the defendant, Ranson."

He then alleges that, pursuant to this agreement, he did send the crops to the firm of Soulié, and that no account of their sale has ever been rendered to him; that the cost of buildings, constructed or repaired, on the plantation, and also the cost of necessary work upon the land, "for their account," has been charged to him, Ranson, and that while some parts of this expense have been paid by the Soulié firm, other items amounting to $5711 25 have not been paid by them, but charged to defendant, and a memorandum or itemized statement of such charges is annexed; that a quantity of valuable effects was left by him on the plantation, belonging to himself, which plaintiff has appropriated, and he finally prays that the members of the Soulié firm be condemned to pay him blank sum of dollars for these various matters of alleged indebtedness.

It is apposite here to notice a novel and unprecedented proceeding on the part of the attorney whose name is signed to this answer. It is an affidavit filed in this court since the oral argument, that this answer was not intended to be used as a part of the pleadings, that he never requested the clerk to file it, and that during the progress of the trial it was never alluded to nor noticed to be of record. Whatever may have been the attention, or want of attention, paid to this answer in the trial in the lower court, it received very marked notice from the counsel of the plaintiff in the oral argument before us. We find it in the record duly certified, and we do not find any attempt by motion or otherwise, prior to or on the trial below, to excerpt it from the pleadings, or to disown its authenticity. Papers once filed by an attorney, of record in a cause, can not be ignored on the plea that the clerk had no special direction to file them, or that no particular attention was paid to their contents in the trial, and particularly is this the case when the paper in question is a

Soulie vs. Ranson.

vital part of the pleadings, drafted by the attorney with elaborate care, and signed as the attorney in the identical case in which it is filed.

Another answer was filed afterward on same day, signed by the local counsel and also by his associates, in which the defendant denies that plaintiff has any right of ownership in and to the property sequestered, and avers that the sale made of the plantation under judicial process was never intended to be a sale translative of property as between the parties, and was never so treated by Soulié until January, 1873, and that defendant was left in possession of the property because of that fact, and continued to possess it as owner; that the agreement of January 23, 1868, was superseded by another, in which Soulié contracted to supply Ranson with means to cultivate the property, which disbursements were to be paid by proceeds of sale of crops shipped to the Soulié firm, and the residue applied to the extinguishment of the debt of Ranson; that in 1870 defendant had an opportunity to sell the property at seventy-five thousand dollars, which would have extinguished his entire debt and given him a surplus of forty thousand dollars, and that he declined the offer, because Soulié advised and urged him not to sell, and promised as a consideration for compliance with his wishes that he would advance all the means necessary for the cultivation of the place; that by reason of Soulié's fraudulent non-compliance with his engagement defendant has been damaged in the full amount of Soulié's debt, and forty thousand dollars besides. A further damage of three hundred dollars for the illegal sequestration is alleged, and judgment is prayed for both sums in reconvention.

Upon these issues the parties went to trial, and a jury rendered a verdict dissolving the sequestration, with three hundred dollars damages, and annulling the sale of April 4, 1868, with twenty-five thousand dollars damages upon the reconventional demand. Judgment was rendered against Soulié accordingly, who appealed.

A motion to dismiss the appeal is made in this court upon the ground that the written opinion of the judge *a quo*, read to the jury, is not in the record. The clerk certifies that there is no written charge of the judge on file, and that the minutes of the court do not show the filing of any. It is not necessary that it should be in the record. This court hears the case anew in its entirety, and reviews the verdict of the jury. If they should have been misled by the charge, or, as in this case is alleged, disregarded the charge, their error can be corrected here without reference to the probable influence of the language of the court upon them.

The motion to dismiss can not prevail.

The record is very bulky, but, notwithstanding its forbidding aspect, we have examined it with diligent minuteness. It discloses one of those

personal histories whose mournful sadness is not relieved by the fre-
quency with which they are met, but is rather intensified by the legal
consequences which follow them. Ranson returned from the perils of
war to find his fair heritage a wilderness of waste. Undaunted by the
difficulties attendant upon recuperation, and refusing to succumb to
misfortune, he undertook the repair of his shattered fortunes with manly
and hopeful courage. From 1865 to 1869 his occupation was cutting and
selling wood, which he was enabled to begin by the loan of a pair of oxen
from a neighbor. Gradual preparations were made during these years
for future cane planting, and in 1869 the first crop was essayed. Mean-
while a judgment had been obtained against him, and his property had
been sold. The verity and reality of this sale, maintained on the one
hand and denied on the other, is the pivot upon which our judgment
must turn.

The testimony of the parties to the suit, and to the agreement of Jan-
uary, 1868, is the source from which we are to derive our knowledge of
their intentions and purposes, guided, in case of conflict, by the circum-
stances under which they acted.

The plaintiff, Soulié's, narrative is as follows:

" On the fourth of March, 1867, with Mr. Ranson's assent, and in per-
fect understanding with him, I entered suit against him for the amount
of my debt. He stated that he had what would plant the next season not
less than one hundred arpents of cane, and was sure, if I would grant
him one, two, three, four, and five years time, he could pay me back my
money and redeem his plantation. This occurred in the parish of St.
Charles on the fourteenth of March, 1867. He was then working the
place on his own hook. He was cutting cord wood, and with the proceeds
of that wood working the cane. I recollect that, speaking of the number
of mules he had on the place, he mentioned something more than thirty,
and he certainly had all the implements of husbandry to work his cane,
nor did he speak of any of the mules belonging to his wife.

" On the fifth of June, 1867, judgment was rendered in my favor in the
suit already mentioned. In accordance with the arrangements above re-
cited, on the twenty-third of January, 1868, we entered into the agree-
ment under private signature which is on file. On the fourth of April,
1868, the property was sold under a writ of execution, and adjudicated
to me for eighteen thousand dollars, and a deed executed. The above-
mentioned contract thereby took effect. It must be observed that in
that contract Mr. Ranson undertook to work the place as a sugar planta-
tion, and he did so work it for that year with the mules and tools he had.
On the twentieth of January, 1869, Mr. Ranson called on me and repre-
sented that he was unable to carry on the plantation any longer without
assistance, and requested me to come to his aid. I having, unfortunately,

·consented, we drew up and signed an agreement of B. & A. Soulié of that date which has been assigned to me.

"From the first year Mr. Ranson has largely exceeded the amount agreed upon (eight hundred dollars monthly), and has never raised a paying crop. (Here follows a statement in figures of receipts and disbursements.) Thus it will be seen that in the four years Mr. Ranson worked the plantation he sank the enormous sum of $28,868 06, exclusive of interest and commissions. Moreover, I had advanced to him in 1870 seven hundred and twenty dollars to pay the schooling of his two youngest boys, and I loaned him three hundred dollars to pay the expenses attending his daughter's marriage. On the twenty-eighth of December, 1871, in view of the disastrous results then made manifest I wrote Mr. Ranson that I withdrew from the agreement of the twenty-third of January, 1868, and that I held myself free from its provisions and at liberty to enter into any new arrangement I might see fit with regard to the plantation by virtue of our contract."

The witness then states that he yielded to Mr. Ranson's importunities, and continued to supply him another year, with the same disastrous result, and finally, in December, 1872, refused to go on longer, and informed Ranson that he should let the plantation, and would give the preference to Ranson if he could get any one to supply him. Ranson said he could manage to go on cultivating, but the means upon which he relied were so slender and so precarious that Soulié thought it was folly to rely on them, and declined to let the place on such prospects. He informed Ranson that he had a good tenant in view, and as he did not wish to put him out on the road he would give him another house to live in until he could find something to do. Upon this Ranson said, "You may rent."

The place was rented to Kelly, reserving the house and dependencies, which had been placed at Ranson's disposal. The lessee took possession on the third of February, 1873, and required an inventory of the movables to be made, which was to be done in a few days. Soulié proceeds: "Thus matters stood. Never had a word of reproach escaped Mr. Ranson's lips; on the contrary, he had extolled my kindness to him to the utmost. He often said I was a father to him," etc. The removal of the mules, etc., followed.

Ranson's version of the transaction is as follows:

"In 1868 Mr. Soulié and myself came to the agreement that I should sell the plantation to arrange my business, and it was perfectly understood that the plantation was to be bought by him, and according to contract he was to buy the place, and I was to dispose of it as if still my own; it was to change nothing except as to the naked title of the plantation. I always continued in the possession of the property, and there never was any change."

After describing the condition of the plantation at the close of the war, and, stating his own occupation for three years immediately succeeding that event, he proceeds: "I cultivated a very small quantity of cane for seed in 1868. I had stock which was engaged in the wood business. I had twenty-six mules and oxen. It was with my own money I bought that stock, money earned with my wood, and in my office of sheriff. That was the stock used in carrying on my wood business, and I afterward used the same stock in cultivating the plantation. I used them in cultivating the plantation after the sale, and under the agreement with Soulié. * * * I bought some seed cane from different parties, small quantities; that is the way I started. I managed my place according to my own judgment, and allowed no one to interfere with said management, it being my place."

The offer of seventy-five thousand dollars for the place, through Meunier, a broker, is then detailed, and he says he wanted to sell, but Soulié dissuaded him, as in his opinion it would be an act of folly, and that he could make his fortune on the place, and get back all he had lost. Ranson replied that he had no means to carry on the planting, and Soulié rejoined that he would furnish him as long as he lived, and would fix his business so that this help should be continued after his death. The offer was declined, defendant says, because of these assurances of Soulié.

"When Mr. Kelly came to the place," the defendant is again speaking, "I told him he could take the house, and I moved to a house on my old place. My reasons for so doing were that, knowing the tract I was living on was bought by Mr. Soulié, and as I had never paid for it, I thought I had no business on Mr. Soulié's premises." Kelly informed him Soulié had rented him the place with the mules, carts, and utensils, and defendant said that could not be correct, as eight mules belonged to his wife, and he affirms that he expressed no willingness to let the fourteen belonging to himself go with the place. Four of these fourteen are dead. The eight belonging to his wife were bought with her money. She is separated in property.

Soulié has no recollection of the conversation with Ranson touching the offer of seventy-five thousand dollars for the place, and, indeed, denies that it occurred. Meunier, the broker, says the offer was made to his partner, White, and that he was not present, and that it was made by a New York insurance agent, then in New Orleans, for other parties, but he does not disclose the names of these parties, nor even of the insurance agent, with whom he had no personal communication.

Mr. Kelly, Jr., son of the lessee, was present at the conversation of his father with Ranson, when the latter came to take possession of the plantation. "Ranson said it was all right, except as to the mules, eight

of which belonged to his wife, but the lessee refused to receive less than the full number, and, announcing that he would have an inventory made, Ranson then said it was immaterial to him, that he was ready to turn over the fourteen mules any day."

The testimony of other witnesses is before us, a detail of which would swell this opinion inconveniently and unnecessarily. It is duly considered in forming our conclusions upon the facts.

The sale of the fourth of April, 1867, controlled in its effect by the agreement of January 23, 1868, which was only putting in more durable form the oral agreement contemporaneous with the sale, has all the features of the *vente à réméré*. The Code thus defines this right of redemption. It is an agreement or paction, by which the vendor reserves to himself the power of taking back the thing sold by returning the price paid for it. Civil Code, articles 2545 *et seq.*, new Nos. 2567. It is a literal translation from the Code Napoleon, omitting a part not of significance here. Code Napoleon, article 1659.

The price paid by Soulié was eighteen thousand dollars, and that stipulated to be paid in redemption was $36,350, and it is "the price paid for it" that the Code designates as that to be returned under this species of sale. It is apparent that the larger sum was really the price paid by Soulié, since his debt amounted to that. The sale was to operate an extinguishment of the mortgage debt. The redemption price should be the amount of that debt with its accruing interest. But were it otherwise, the French authorities sanction the validity of a stipulation for the return of a larger price.

Gilbert, annotating the article of the Napoleon Code already mentioned, says :

"On peut valablement stipuler que le vendeur paiera à l'acquéreur une somme plus forte que celle constitue le prix de la vente." 9 Mars, 1808.

Pothier says such an agreement has nothing illicit in it (Traité du Contrat de Vente, No. 413) ; and Merlin is of same opinion. Repertoire, Faculté de Rachat, No. 8. The commentators are not, however, in entire unanimity, but the reasoning of Delvincourt and his two associates in opinion does not apply in this case. Duvergier combats them thus :

"Si l'on se borne à dire que cette stipulation décèle la fraude et l'usure, que les tribunaux à qui l'on ne fournira point d'explications satisfaisantes, qui d'ailleurs apercevront d'autres indices, pourront annuler la convention ou réduire les intérêts, je ne conteste pas cette doctrine ; mais on est évidemment dans l'erreur si l'on prétend avec MM. Delvincourt, Duranton, et Troplong, que la convention est *illicite*. Ces auteurs ont cédé à un mouvement naturel d'animadversation contre les ruses des prêteurs. Préoccupés du désir louable de déjouer leurs spéculations, ils ont créé une prohibition que la loi n'établit point; ils ont déclaré toujours et de droit frauduleuses et usuraires des stipulations qui

le sont souvent, mais qui quelquefois peuvent être loyales et légales; confondant ainsi, il faut bien le dire, les innocents avec les coupables.

"Pothier a reconnu que la convention n'a rien en soi d'illicte, et un arrêt de la Cour de Paris a consacré cette doctrine." Tome 2, No. 12.

The stipulation for an increased redemption price in this suit was not a cloak for usurious charges.

This sale, with right of redemption, under the circumstances of that time, seems to us a natural arrangement for the parties. Both appear to have had great confidence in the future. No doubt Ranson thoroughly believed in and trusted to his ability to meet the stipulated payments. All he wanted was the help of capital to enable him to utilize his splendid opportunities, and Soulié was the god who could dispense the shower of gold. If the mortgage were foreclosed without an arrangement between the parties, Soulié might become the owner, unhampered by any obligation touching the redemption. And here the defendant's counsel earnestly insist that the true interpretation of Soulié's conduct is that all of his complaisant promises were made to induce Ranson to accord him a judgment without opposition, for, if prescription had been pleaded, Soulié's debt was lost.

This is reading events of that day by the light of the present time. In April, 1867, the date of rendition of this judgment, prescription was not supposed to be legally applicable to debts situated like this. Deduct the years of the war, and the debt was safe. And prescription was a plea invoked by few in those days against a just debt.

The doctrine of this court in April, 1867, was that the circumstances and facts of each case, and the respective situations of the parties must be taken into consideration in applying the plea of prescription. Munson vs. Robertson, 19 An. 170. Throughout the Annual Reports of 1868 there was a hazy indefiniteness on the bench and at the bar upon this mooted question. Rabel vs. Poarciau, 20 An. 131; Durbin vs. Taylor, *idem*, 219; Payne vs. Douglas, *idem*, 280; Marcy vs. Steel, *idem*, 413; Norwood vs. Mills, *idem*, 422 Lemon vs. West, *idem*, 427; Schlenker vs. Taliaferro, *idem*, 565.

It was not until February, 1869, that this court authoritatively and unqualifiedly declared that the maxim *contra non valentem agere non currit prescriptio* has no application in our system of jurisprudence, and thus terminated the dispute in which the chances of victory had often oscillated. Smith vs. Stewart, 21 An. 67.

But, independent of all this reasoning upon probabilities, there is the actual fact that Ranson did agree that in case neither he nor the person whom he should designate performed the acts specified in the writing of January, 1868, by a given date, "his failure so to do shall work a nullity of the contract." The answer to this suit, prepared and exhibited to

Soulie vs. Ranson.

Soulié before his departure for Europe, when his first deposition was taken, "admits and avers that the plantation belongs to the plaintiff," and, although the second answer is filed the same day as the first, it was prepared some time afterward under new advice, and when a change in the defense was deemed advisable. It is not permissible to deny what one has solemnly acknowledged in a judicial proceeding. The admissions are made stronger by being transmuted into averments which he can not be permitted to gainsay. Estill vs. Holmes, 3 Rob. 134; Gridley vs. Conner, 4 An. 417; Denton vs. Erwin, 5 An. 18.

It follows that the defendant is not entitled to damages for Soulié's refusal to sell what was his own, and we may add, had the property been Ranson's, he could not recover damages from Soulié for giving him bad advice in relation to an act the performance of which depended on his own volition.

Reverting now to the original action, it is abundantly proved that the mules on the place at the time of the sale of the plantation were bought with the defendant's own money and his wife's paraphernal funds. We find nothing conveyed in the *proces verbal* of sale besides the land. Neither mules nor implements of husbandry are mentioned, or included in its terms. After the sale, and during the four years cultivation, many mules were bought with Soulié's money, but Ranson is charged with the funds thus expended. This cultivation of the plantation by Ranson is under a contract quite distinct from that of January 1868—so distinct that his counsel insist it superseded the first contract—and the property purchased then was bought and charged after the same fashion that factors here observe in their purchases for their country clients. The planter orders the animals or other things needed. The factor buys, or has them bought, and charges the price, with commission, to the planter. The animals belong to the planter. The factor is creditor to him for the price, etc.

Soulié has not sued for the price of the mules. His sequestration is based upon the theory of ownership, which has been demonstrated to be unfounded.

It is therefore ordered, adjudged, and decreed that the judgment of the lower court setting aside the sequestration of the mules with three hundred dollars damages against plaintiff is affirmed, and it is further ordered, adjudged, and decreed that the judgment of the lower court in favor of the defendant upon his reconventional demand annulling the sale of the plantation, with twenty-five thousand dollars damages, is avoided and reversed, and that said reconventional demand be rejected, and that defendant recover of plaintiff the costs of both courts, except the costs of the reconventional demand, which are to be paid by him.